## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **VIRGINIA EDWARDS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:24-cv-1386-ACA** |
| | } | |
| **CITY OF LEEDS,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Plaintiff Virginia Edwards worked as the Children's Director at the Leeds Jane Culbreth Library. In 2022, the Leeds Library Board wanted Ms. Edwards to complete a grant application to secure additional funding for the library. But Ms. Edwards believed that she could not properly complete the application because the application required the library director's signature, and the position was vacant. Nevertheless, Susan Miller, a Board member, instructed Ms. Edwards to complete the application.[1] Still believing there was no qualified person to sign the application, Ms. Edwards did not complete and submit the application by its deadline.

When Susan confronted Ms. Edwards about the failure to complete the application, the two had a tense conversation; Susan felt that Ms. Edwards had been

---

[1] The court refers to Susan Miller and fellow Board member Linda Miller by their first names to avoid confusion.

disrespectful. The next day, Ms. Edwards posted on Facebook that she suffered from depression and anxiety. The post added that her life had been worse over the past few years because public and school librarians had been persecuted.

Based on these events, the Board members voted unanimously to recommend the City discipline Ms. Edwards. Leeds Mayor David Miller terminated Ms. Edward's employment, and this lawsuit followed. Ms. Edwards asserts one claim for disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112. (Doc. 1). The City moves for summary judgment. (Doc. 19). The court **WILL GRANT** the City's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor.

## I.      BACKGROUND

At the summary judgment stage, the court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve[s] all reasonable doubts about the facts in favor of the non-movant." *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022) (quotation marks omitted). Where the parties have presented evidence creating a dispute of fact, the court's description of the facts adopts the version most favorable to the nonmovant. *See id.*; *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts.").

Ms. Edwards has struggled with depression and anxiety since she was twelve years old. (Doc. 20 at 21). She takes prescription medication to manage her symptoms and sees a counselor. (*Id.* at 21–22).

In 2016, Ms. Edwards became the Children's Director at the Leeds Jane Culbreth Library. (*Id.* at 9, 29). In her role, Ms. Edwards managed children's services, including writing grant applications and organizing programming. (*Id.* at 29). Until 2022, Ms. Edwards's direct supervisor was Melanie Carden, the library's director. (*Id.* at 10–12). At some point during her employment, Ms. Edwards told Ms. Carden that she suffered from depression and anxiety and used her paid time off as mental health days. (*Id.* at 20, 22). However, Ms. Edwards never requested an accommodation in any other form because of her depression and anxiety, and no documents in her personnel file reflect that she suffers from depression and anxiety. (Doc. 20 at 21–22). Ms. Carden left her position at the library in April 2022 (*id.* at 8), so Ms. Edwards did not have a supervisor and reported to "no one" (*id.* at 10).

Although the library is a department of the City of Leeds (doc. 21 at 4, 14; doc. 25 at 5), the Leeds Library Board acts as the policy-setting body for the library (doc. 27 at 7). The Board has authority over the library director but does not govern other library employees. (Doc. 20 at 7, 11; doc. 21 at 14). So it does not have the authority to issue directives to library employees. (Doc. 20 at 11; *see* doc. 21 at 14).

On April 26, 2022, the Board held a meeting. (*See* doc. 20 at 15; doc. 26 ¶ 3; doc. 27 at 22). Among other topics, the Board discussed applying for grants to assist with library funding and making Tisha George the library's interim director. (*Compare* doc. 25 at 69, *with* doc. 27 at 75; *see also* doc. 28 ¶ 3; doc. 27 at 28). Although present at the meeting, Ms. Edwards does not recall Board members asking or directing her to complete any grant application. (Doc. 20 at 15). But the Board members believed that Ms. Edwards would complete an application for a grant. (Doc. 25 at 6, 9; doc. 27 at 21, 23). The Board also tabled a motion to make Ms. George the interim director, leaving the position open. (Doc. 20 at 16; doc. 25 at 16; doc. 27 at 17).

After the meeting, Ms. Edwards spoke to Susan about the requirements for completing the application. (Doc. 27 at 21; doc. 28 ¶ 4; *see also* doc. 33 at 5 ¶ 12; doc. 36 at 4 (not disputing ¶ 12)). Ms. Edwards informed Susan that the grant application would need a Board member's signature, so Susan agreed to meet Ms. Edwards the next day to sign the application ahead of the application's April 29, 2022 deadline. (Doc. 28 ¶¶ 4–5).

The day after the meeting, Ms. Edwards spoke with Susan and explained that she would not complete the application because it required the library director's signature and—because the library did not have a director—there was no qualified person to sign the application. (Doc. 20 at 16–17; doc. 27 at 22–23; doc. 28 ¶ 5).

4

Susan then called Board member Linda Miller to determine whether there would be any issues submitting the application without a library director's signature. (Doc. 27 at 22–23; doc. 28 ¶ 5). After discussing the issue with Linda, Susan called Ms. Edwards again and directed her to complete the application and have the Library Board Chairman Brent Reese sign it. (Doc. 20 at 17; doc. 27 at 22–23; doc. 28 ¶ 5; doc. 33 at 5 ¶ 14; doc. 36 at 4–5 (not disputing that Susan directed her to complete the application)). The grant application's deadline passed, and Ms. Edwards did not complete it. (*See* doc. 20 at 16–17).

On May 10, 2022, Susan asked Ms. Edwards about the application status. (Doc. 28 ¶ 6). Ms. Edwards informed Susan that she did not submit the application. (*Id.*; doc. 20 at 17). The two had a "tense" and unpleasant conversation about Ms. Edwards's failure to submit the application. (Doc. 20 at 17; doc. 28 ¶ 6). Susan called Linda and informed her of the interaction with Ms. Edwards. (Doc. 25 at 6–7; doc. 27 at 11). Linda instructed Susan to prepare a written statement reflecting her view of the interaction. (Doc. 25 at 8; doc. 27 at 11–12). Susan then drafted a written statement to share with the other Board members at their next meeting, explaining that she felt Ms. Edwards had been hostile and disrespectful. (Doc. 27 at 12; doc. 28 ¶ 7; *see also* doc. 29). Susan also spoke to Chairman Reese, telling him that she felt Ms. Edwards was disrespectful and insubordinate. (Doc. 28 ¶ 6).

The next day, Ms. Edwards posted on Facebook. (*See* doc. 20 at 17–18; doc. 25 at 75–76). The post included a photo of herself at the library. (Doc. 20 at 18; doc. 25 at 75–76). The post stated:

> This is what it looks like to be near your breaking point. This is what high stress, high anxiety, depression, and vulnerability looks like. Can you tell by looking at me how I'm truly feeling? Can you tell by looking at me that life has literally been hell for the past 4 months? Can you tell by looking at me that I am barley [sic] keeping it together to get up and go to work each day? You can't? That's because most people choose not to look to [sic] deeply. As a society we hide behind pleasantries and short meaningless conversations to shield how we're truly feeling and too [sic] not dig to [sic] deeply into the lives of others. Several years ago, when someone would ask me how I was doing I began to answer them honestly. "How's your day Ginny?" "Honestly I've had better days." Simple as that. Most people don't know how to respond. The ones that get it acknowledge and empathize. The ones that don't understand normally say, "Well I'm sure it'll get better." I have coping mechanisms and strategies I use to calm my anxiety. They're not working. I am back in a place I vowed never to be again. How fitting that it's Mental Health Awareness Month. Check on your library friends. They are not ok. Public and school librarians are being persecuted. The past 2 years were rough. The last few months have been an absolute nightmare. I'm not ok. Are you? #mentalhealthawarenessmonth #mentalhealth #depression #anxiety #vulnerability #breakingpoint #help #librariansarenotok #selfcare #notok #butiwillbe #support

(Doc. 25 at 75).

Less than a week later, the Board held a regularly scheduled meeting. (Doc. 28 ¶¶ 6–7). At the meeting, the members discussed Ms. Edwards's interaction with Susan, her failure to complete the grant application, and her Facebook post. (Doc. 25 at 10; doc. 26 ¶¶ 5–8; doc. 27 at 13; doc. 28 ¶¶ 10–12). Although Susan and Linda

could not point to specific policies, they believed Ms. Edwards's post was disparaging and violated City policies because it was disrespectful and unprofessional. (Doc. 25 at 14–15, 18; doc. 27 at 13). The Board members voted unanimously to ask the City to discipline Ms. Edwards in any manner "up to and including" termination. (Doc. 25 at 10, 73; doc. 27 at 17; doc. 26 ¶¶ 10–11).

After the meeting, Linda called Leeds Mayor David Miller to inform him about the Board's vote and request that he discipline Ms. Edwards. (Doc. 21 at 8; doc. 22 ¶ 4; doc. 25 at 11). Mayor Miller had the city administrator draft a termination notice. (Doc. 23 at 4–5). The notice includes four grounds for termination: (1) insubordination, (2) demeanor, (3) violation of the City's social media policy, and (4) safety of patrons and employees. (Doc. 25 at 74). Susan and Linda provided the description of the offenses listed in the termination notice. (Doc. 23 at 5). Mayor Miller terminated Ms. Edwards on May 20, 2022. (Doc. 21 at 7; doc. 22 ¶ 8; doc. 23 at 30).

## II.   DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Ms. Edwards contends that the City discriminated against her in violation of the ADA when Mayor Miller terminated her employment after she posted on Facebook that she suffered from depression and

anxiety. (*See* doc. 1 ¶¶ 11–27). The City argues that Ms. Edwards failed to (1) establish that she has a disability as defined by the ADA, (2) produce evidence that creates a genuine issue of fact whether the City knew about her disability and intentionally discriminated against her based on it, and (3) demonstrate that the City's proffered reasons for dismissing her were pretextual. (Doc. 33 at 10–37). The court agrees that Ms. Edwards has not established that she has a disability under the ADA. Because this question is dispositive of her claim, the court does not address the City's other arguments.

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To be disabled under the ADA, a plaintiff must (1) have "a physical or mental impairment that substantially limits one or more major life activities," (2) have a "record of" such an impairment, or (3) be "regarded as" having such an impairment. *Id.* § 12102(1).

The City argues that Ms. Edwards has not produced any "competent and admissible evidence" that she has a mental impairment that substantially limits a major life activity. (Doc. 33 at 22–32). In response, Ms. Edwards contends that her testimony is sufficient to establish that she suffers from depression and anxiety, which are mental impairments under the ADA, and regardless, the City "regarded" her as having a disability. (Doc. 36 at 16–21). Neither of Ms. Edward's arguments are persuasive.

Ms. Edwards did not produce evidence that she is "actually disabled" under the ADA. *See Lewis v. City of Union City*, 934 F.3d 1169, 1180–81 (11th Cir. 2019). Even assuming that Ms. Edwards's testimony alone is sufficient to establish that she has an ADA-protected impairment, she has not presented any evidence that her depression and anxiety "substantially limits one or more major life activities." 42 U.S.C. § 12102(1). Ms. Edwards's brief focuses only on whether she has an impairment, citing evidence that she was diagnosed with depression and anxiety when she was a teenager, prescribed medication, and received counseling at the time of her termination. (Doc. 36 at 20; *see also id.* at 7 ¶¶ 1–4). Ms. Edwards does not proffer any evidence about the effect of her depression or anxiety on her major life activities. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . ."); *Bragdon v. Abbott*, 524 U.S. 624, 637 (1998) ("The [ADA] is not operative, and the definition not satisfied, unless the impairment affects a major life activity."). Accordingly, Ms. Edwards has not satisfied her burden of showing a genuine issue of fact as to whether she is disabled under the ADA's first definition of "disabled." *See Lewis*, 934 F.3d at 1180–81 (holding a plaintiff was not "actually disabled" because the plaintiff failed to present evidence that her impairment substantially limited major life activities).

Nonetheless, a plaintiff is disabled under the ADA if she "is perceived as having[] an impairment that is not transitory and minor." *Equal Emp. Opportunity*

*Comm'n v. STME, LLC*, 938 F.3d 1305, 1314 (11th Cir. 2019). To qualify as disabled under the ADA's "regarded as" prong, an "individual [must] establish[] that he or she has been subjected to an action prohibited under this chapter *because of* an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A) (emphasis added). So to be "regarded as" disabled, Ms. Edwards must present evidence sufficient to raise a genuine issue of fact that the City (1) perceived her as disabled and (2) terminated her because of that perception. *See id.*; *Lewis*, 934 F.3d at 1181, 1184. Ms. Edwards has not created a material dispute of fact that the Board members recommended her dismissal because of their perception that she is disabled.[2]

Ms. Edwards argues only that the Board members regarded her as disabled because they viewed her Facebook post—which mentioned "high anxiety" and depression—and subsequently cited the post as one justification for her termination. (Doc. 36 at 18–20). Even assuming that viewing the post is sufficient to establish that the Board members perceived Ms. Edwards as disabled, she has not presented evidence to support her contention that the Board members recommended disciplining her "because of" the perceived disability. (*See* doc. 36 at 12–16, 22–30);

---

[2] The court assumes without deciding that cat's paw theory applies and thus considers the actions of the Board members.

10

42 U.S.C. § 12102(3)(A). The undisputed evidence establishes that the Board members began discussing whether to recommend that the City discipline Ms. Edwards before she made the Facebook post. (Doc. 25 at 6–7, 76; doc. 27 at 11; doc. 28 ¶¶ 6–10). And she does not provide any evidence that connects her termination with her disability, such as statements made by Board members about Ms. Edwards's depression or anxiety, prior discriminatory actions, any unusual steps in her termination process, or a similarly situated non-disabled individual who was treated more favorably. (*See* doc. 36 at 12–16); *cf. Lewis*, 934 F.3d at 1181 (finding an employer regarded an employee as disabled when the employer referred to the FMLA and her medical conditions when placing the employee on leave); *see also Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1194 (11th Cir. 2024) ("The ADA's text requires a plaintiff alleging disparate treatment to prove that she was treated less favorably than a similarly situated, non-disabled person.") (quotation marks omitted) (alterations accepted).

Ms. Edwards contends that the City's proffered reasons for her termination were pretextual. (*See* doc. 36 at 22–23). But without evidence that the action was based on discriminatory animus, the arguments purportedly showing pretext are insufficient. *See Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1218 (11th Cir. 2021) ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all if the action is not for a *discriminatory*

11

reason.") (quotation marks omitted). And as explained, Ms. Edwards proffers no evidence that the Board members and Mayor Miller terminated her employment based on discriminatory animus.

Moreover, even considering Ms. Edwards's pretext arguments, most focus on the wisdom of her termination. (*See* doc. 36 at 22–30). Yet "the pretext inquiry centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Todd*, 998 F.3d at 1218 (quotation marks omitted). She proffers no evidence "to suggest that [the Board members and Mayor Miller] did not honestly believe" their proffered reasons for her termination. *See id.* Although Ms. Edwards argues that the Board members did not actually believe that she was a safety threat, Mayor Miller, Susan, and Linda testified that the safety justification was based on her interaction with Susan because of Ms. Edwards's "aggressive" nature. (Doc. 21 at 18–19; doc. 22 ¶ 6; doc. 25 at 15–16; doc. 26 ¶ 15; doc. 27 at 26, 29–30; doc. 28 ¶ 11). Nevertheless, Ms. Edwards contends that "the 'safety' concern appears to have been drawn from the Facebook post's discussion of anxiety and depression—a classic example of stereotyping mental health conditions as dangerous." (Doc. 36 at 26). But Ms. Edwards proffers no evidence connecting the two. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact.").

12

\* \* \*

Producing evidence of a disability within the ADA's statutory definition is a threshold issue in an ADA case. *See STME, LLC*, 938 F.3d at 1318 (concluding that employees could not state a claim under the ADA because they did not allege sufficient facts to establish a disability under the ADA); *see also Ray v. Glidden Co.*, 85 F.3d 227 (5th Cir. 1996) ("The threshold question is whether [the plaintiff] had the requisite ADA 'disability.'"). Because Ms. Edwards has not produced sufficient evidence to create a genuine issue of fact as to whether she was actually disabled or that the City terminated her because of a perceived disability, she failed to establish that she was disabled under the ADA. *See Lewis*, 934 F.3d at 1184 & n.12 (explaining that causation is "built in to the 'regarded as' definition of disabled"). Accordingly, the court **WILL GRANT** the motion for summary judgement in favor of the City and against Ms. Edwards. (Doc. 19).

## III.    CONCLUSION

The court **WILL GRANT** the City's motion and **WILL ENTER SUMMARY JUDGMENT** in its favor and against Ms. Edwards. (Doc. 19).

**DONE** and **ORDERED** this July 14, 2026.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE

13